UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| VICENTE FIGUEROA NAVA,<br><br>                    Petitioner,<br><br>     v.<br><br>CAMMILLA WAMSLEY et al.,<br><br>                    Respondents. | CASE NO. 2:26-cv-00459-DGE<br><br>ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS (DKT. NO. 1) |

This matter comes before the Court on Petitioner Vicente Figueroa Nava's petition for writ of habeas corpus. (Dkt. No. 1.) For the reasons discussed below, the Court GRANTS the petition.

**I    BACKGROUND**

Petitioner, a native and citizen of Mexico, applied for admission into the United States from Mexico at the "Ysidro Port of Entry vehicle primary lane number three" on April 16, 2021. (Dkt. No. 6-1 at 2.) While the Court does not have a copy of Petitioner's original Notice to Appear, it is reported that on the day Petitioner applied for admission, "U.S. Customs and Border

Protection ("BP") determined Petitioner was inadmissible and issued a Notice to Appear ('NTA'), charging him as removable under Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA').[1] Petitioner was then paroled in under Section 212(d)(5)." (Dkt. Nos. 5 at 2, 6-2 at 4.)[2] Petitioner's April 2021 Notice to Appear was "subsequently cancelled." (Dkt. No. 5 at 2.)

A superseding NTA was issued on August 18, 2021. (Dkt. No. 6-1 at 2.)[3] Petitioner was identified as an "arriving alien" subject to "removal proceedings under section 240 of the Immigration and Nationality Act" and charged with removability under INA § 212(a)(7)(A)(i)(I). (*Id*. at 2, 5.) This NTA scheduled Petitioner for a hearing in Seattle on May 3, 2022. (*Id*. at 2.) The government does not identify whether Petitioner failed to appear at the May 3, 2022 hearing. However, Petitioner did file an application for relief, an asylum application, with the court on June 2, 2022; it remains pending. (Dkt. Nos. 5 at 2; 1 at 2.) Petitioner has a master [calendar] hearing for May 6, 2026 in Seattle. (Dkt. No. 6-2 at 5.)

On January 7, 2025, Petitioner was enrolled in the Alternatives to Detention (ATD) program with Yakima, WA BI-ISAP and informed "of the conditions and requirements of being placed into the ATD program in lieu of being placed in immigration custody." (Dkt. No. 6-2 at 4.) Deportation Officer Paul Correa asserts Petitioner committed two ATD violations on January 14, 2025 and additional ATD violations on January 23, 2025; February 20, 2025; March 27, 2025; May 29, 2025; June 19, 2025; June 26, 2025; July 17, 2025; July 24, 2025; August 28, 2025; and January 2, 2026; specifically, Petitioner "failed to complete biometric check-ins or

---

[1] INA § 212(a)(7)(A)(i)(I) is codified at 8 U.S.C. § 1182(a)(7)(A)(i)(I).

[2] INA § 212(d)(5) is codified at 8 U.S.C. § 1182(d)(5).

[3] This Notice to Appear indicates the initial Notice to Appear was issued on April 30, 2022. (Dkt. No. 6-1 at 2.)

enable necessary locations services to verify his location" on these dates." (Dkt. No. 5 at 2–3.) Respondents assert, based on these asserted failures, "Seattle, WA ICE/ERO management determined that [Petitioner] was to be removed from the ATD program and placed into detention until his immigration case is adjudicated." (Dkt. No. 6-2 at 5.) Petitioner "was instructed to report to the Yakima ICE/ERO office on January 13, 2026, so that ICE/ERO could apprehend him." (*Id.* at 3.)

Petitioner acknowledges he "was required to upload a photo to the ISAP app every Thursday, asserts he "made every effort to upload his photo on time, and denies having failed to do so on the dates provided by Respondents." (Dkt. No. 7 at 2.)

On January 13, 2026, Petitioner reported to the Yakima, WA ICE/ERO office at approximately 9:25 a.m. *as instructed*. (Dkt. No. 6-2 at 3.) Approximately five minutes later, Petitioner "was led into a back office" and informed "the officers present [were] immigration officers and that he was being placed into custody due to violating the terms of his release on recognizance." (*Id.*) Petitioner has been detained at Northwest Immigration & Customs Enforcement Processing Center ("NWIPC") since January 13, 2026.

On February 7, 2026, Petitioner filed a petition for writ of habeas corpus alleging his parole was revoked in violation of the Due Process Clause of the Fifth Amendment. (Dkt. No. 1.) Respondents filed a response on February 23, 2026. (Dkt. No. 4.) Petitioner filed a reply on February 25, 2026. (Dkt. No. 7.)

## II    LEGAL STANDARD

### A. Habeas Petitions

A writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. CONST., Art. I, § 9, cl. 2). To

succeed on his habeas petition, Petitioner "must show [he] is in custody in violation of the Constitution or laws or treaties of the United States." *Doe v. Bostock*, No. C24-0326-JLR-SKV, 2024 WL 3291033, at *5 (W.D. Wash. Mar. 29, 2024), *report and recommendation adopted*, No. C24-0326JLR-SKV, 2024 WL 2861675 (W.D. Wash. June 6, 2024) (citing 28 U.S.C. § 2241). Because habeas proceedings are civil in nature, the "[p]etitioner 'bears the burden of proving that he is being held contrary to law, . . . [and] he must satisfy his burden of proof by a preponderance of the evidence.'" *Aditya W. H. v. Trump*, No. 25-cv-1976, 2025 WL 1420131, at *7 (D. Minn. May 14, 2025) (quoting *Freeman v. Pullen*, 658 F. Supp. 3d 53, 58 (D. Conn. 2023) (citations omitted)).

**B. Parole**

Respondents assert Petitioner is an applicant for admission who is subject to mandatory detention pursuant to 8 U.S.C. § 1225(b). (Dkt. No. 4 at 5.) Petitioner does not challenge the assertion he is detained subject to 8 U.S.C. § 1225(b). (*See generally* Dkt. Nos. 1, 7.) Accordingly, the Court assumes Petitioner is detained pursuant to § 1225(b).

8 U.S.C. § 1182 provides that individuals subject to § 1225 may be granted parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit[.]" 8 U.S.C. § 1182(d)(5)(A). The implementing regulations include another requirement for parole: the noncitizen must "present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b). In other words, if a noncitizen has been granted parole, it means that a DHS official with authority decided that there were either "urgent humanitarian reasons" or "significant public benefit" justifying the parole of that individual, and that the individual did not pose a security or flight risk.

To revoke parole, in turn, (1) "the purpose for which parole was authorized" must have been accomplished or a DHS official with authority must decide that "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States"; and (2) written notice must be provided to the noncitizen. 8 C.F.R. § 212.5(e)(2)(i) (upon accomplishment of the purpose for which parole was authorized or in the opinion of one of the officials that neither humanitarian reasons nor public benefits warrants continued presence, "parole shall be terminated upon written notice to" the noncitizen); *see also* 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled[.]"). The authority of the DHS Secretary can be exercised by "the Assistant Commissioner, Office of Field Operations; Director, Detention and Removal; directors of field operations; port directors; special agents in charge; deputy special agents in charge; associate special agents in charge; assistant special agents in charge; resident agents in charge; field office directors; deputy field office directors; chief patrol agents; district directors for services; and those other officials as may be designated in writing[.]" 8 C.F.R. § 212.5(a).

### III    ANALYSIS

The Due Process Clause of the Fifth Amendment protects against deprivation of liberty without proper process, and this protection extends to deportation proceedings. U.S. CONST. amend. V. ("No person shall be . . . deprived of life, liberty, or property, without due process of law[.]"); *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings.") (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). The traditional test for evaluating due process claims set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), "can and must account for

the heightened governmental interest in the immigration detection context." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Determining whether a governmental action violates "the specific dictates of due process generally requires consideration of three distinct factors:"

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 335.

### A. Private Interest

Even individuals subject to § 1225 and released pursuant to 8 U.S.C. § 1182(d)(5)(A) over whose liberty the government wields significant discretion retain a protected interest in their liberty. *See Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) ("The fact that a decision-making process involves discretion does not prevent an individual from having a protectable liberty interest."); *Hurd v. D.C., Gov't*, 864 F.3d 671, 683 (D.C. Cir. 2017) (holding that re-detention after pre-parole conditional supervision requires a pre-deprivation hearing); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, in probation context); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (same, in parole context). Although in some circumstances the initial decision to detain or release an individual may be within the government's discretion, the government's decision to release an individual from custody creates "an implicit promise," upon which that individual may rely, that their liberty "will be revoked only if [they] fail[ ] to live up to the . . . conditions [of release]." *Morrissey*, 408 U.S. at 482.

Respondents themselves acknowledge Petitioner has "some liberty interest in his continued freedom from detention while on release" but argue "that interest was expressly contingent on compliance with ATD conditions" and "substantially reduce[d]" by his alleged ATD violations. (Dkt. No. 4 at 8.) But Respondents cite, and the Court is aware of, no case law holding alleged violations of terms of conditions of release decrease one's interest in remaining free from imprisonment. Petitioner was at liberty for close to five years, applied for asylum with the Immigration Court, and presumably is eligible for or has been given work authorization. *See* 8 C.F.R. § 274a(c)(8). If anything, Petitioner's liberty interest has only increased, rather than been diminished, over time.

Accordingly, Petitioner's strong private interest in his continued liberty means the first *Mathews* factor weighs in his favor.

### B. Risk of Erroneous Deprivation

The second *Mathews* factor examines "the risk of an erroneous deprivation of [the petitioner's private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards[.]" *Mathews*, 424 U.S. at 335. Respondents assert there was no risk of erroneous deprivation because Petitioner's interest in remaining at liberty "was expressly contingent on compliance with ATD conditions." (Dkt. No. 4 at 8.)

But merely asserting Petitioner violated his ATD conditions is insufficient to justify his detention. This Court, in *Zavorin v. Wamsley*, No. 2:26-cv-00173-DGE (W.D. Wash. Feb. 5, 2026), held "the risk of erroneous deprivation is significant where the government fails to follow its own procedures for revocation of parole" as set forth in 8 C.F.R. § 212.5(e)(2)(i). 2026 WL 309733, at *4. Here, too, Respondents failed to comply with the requirements set forth in § 212.5(e)(2)(i). Respondents do not assert that they revoked Petitioner's parole because the

DHS Secretary or any other authorized individual determined that the purposes of the parole have been served or that subsequent changes justified Petitioner's re-detention, and instead vaguely assert "Seattle, WA ICE/ERO management determined that [Petitioner] was to be removed from the ATD program and placed into detention until his immigration case is adjudicated." (Dkt. No. 6-2 at 5.)  Nor do Respondents assert that they provided Petitioner with written notice of his revocation, as required by 8 C.F.R. § 212.5(e)(2)(i). (*Id*. at 3; Dkt. No. 7 at 2.)

Moreover, Petitioner has been in contact with Respondents and Respondents have known his whereabouts since Petitioner was paroled in 2021.  Petitioner filed an asylum application, and it remains pending with the Immigration Court.  Respondents also directed Petitioner to appear at their field office on January 13, 2026—evidencing clear communication between Respondents and Petitioner—and Petitioner in fact appeared as directed.  Had Petitioner been given an opportunity to address any alleged deficiencies in complying with his conditions of parole, action other than detention may have been taken.

Accordingly, Petitioner faced a high risk of erroneous deprivation when he was detained in a way inconsistent with written ICE procedure.

**C. Government's Interest**

The third *Mathews* factor contemplates "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

Respondents have an interest in ensuring a noncitizen appears at future immigration proceedings and that a noncitizen does not pose a danger to the community. *Zadvydas*, 533 U.S. at 690 (government has an interest in "ensuring the appearance of [noncitizens] at future

immigration proceedings" and "preventing danger to the community"). And although requiring a pre-detention process in this case would present some administrative burden, given the high risk of erroneous deprivation and the fundamental liberty interest at stake, providing effectively no pre-detention process—as ICE did here—is constitutionally deficient. And although "there may be situations that urgently require arrest, in which a prompt post-deprivation hearing is appropriate," *Guillermo M.R. v. Kaiser*, 791 F. Supp. 3d 1021, 1036 (N.D. Cal. 2025) (citing *Zinermon v. Burch*, 494 U.S. 113, 128 (1990)), Respondents offer no basis to conclude Petitioner's circumstances presented such an urgent scenario—again, Petitioner appeared at an immigration field office as instructed upon request. Furthermore, the Court acknowledges that the government has a strong interest in returning noncitizens to custody who violate conditions of release, but this interest does not give the government absolute authority to re-detain individuals it asserts violated terms of release. *O.F.B. v. Maldonado*, No. 25-CV-6336 (HG), 2025 WL 3277677, at *7 (E.D.N.Y. Nov. 25, 2025) ("[T]he government's interest in efficient administration of the immigration laws at the border is not impermissibly burdened by affording the process laid out in 8 C.F.R. § 212.5 because it is required to follow its own regulations." (citation modified)).

In sum, all three *Mathews* factors favor Petitioner. Respondents' detention of Petitioner violates the due process protections afforded to him by the Constitution. Petitioner has proven by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c).

### IV    CONCLUSION

For the reasons set forth above, the Court GRANTS Petitioner's writ of habeas corpus (Dkt. No. 1) and ORDERS:

1. Respondents and all their officers, agents, attorneys, and persons acting on their behalf or in concert with them SHALL release Petitioner from custody within **ONE (1)** day of this order and return him to his previous conditions of release.

2. Petitioner SHALL not be re-detained without first complying with pre-deprivation requirements identified in 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5(e)(2)(i).[4]

3. Within **TWENTY-FOUR (24)** hours of this Order, Respondents SHALL provide the Court with a declaration confirming Petitioner has been released from custody.

4. Lastly, Petitioner seeks an award of attorney fees.  (*See* Dkt. No. 1 at 10.)  Petitioner is GRANTED leave to file a motion for attorney fees.  The motion for fees shall identify the legal authority supporting an award of fees and shall be filed no later than **June 2, 2026**, which is approximately 30 days after the 60-day appeal period.  If no motion is filed by such date, this matter will be closed.

The Clerk is directed to calendar this event.

Dated this 3rd day of March, 2026.



David G. Estudillo
United States District Judge

---

[4] Petitioner asks the Court to impose the requirement that Respondents must prove by clear and convincing evidence that Petitioner is a flight risk or a danger to the community prior to being re-detained.  8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5(e)(2)(i) do not required this and the Court is unaware of any caselaw that would support such a conclusion.  *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1211 (9th Cir. 2022) ("We are aware of no Supreme Court case placing the burden on the government to justify the continued detention of an alien, much less, through an elevated 'clear and convincing' showing.").